I'm Justice Bertina Lampkin, along with Justice Hoffman and Justice Martin. I have to say you've given us a very interesting case. We normally give 15 minutes for each side, and the appellant is allowed to reserve some time for rebuttal. We're not going to be tight on that, because I suspect that there will be quite a few questions. But however much time we give the appellant, we'll certainly give to the appellee. I'd like the parties, please, to identify themselves for the record. Thank you, Your Honor. Michael Rieses for the Defendant Appellant Alliance Shippers. Thank you. Good morning, Justices. My name is Brad Cosgrove, and I represent the Plaintiff Appellee, Gustavo Cornejo, Jr. All right, and Mr. Cosgrove, how much time would you like to reserve for rebuttal? I think that question is up to me. I'm sorry. It is to you, Mr. Rieses. I'm sorry. Well, I would like five minutes for rebuttal, but I understand that it is an interesting case, and we're here at your pleasure. But I think five minute rebuttal should be sufficient, depending upon how much time I get for my main argument. All right. I'm going to start out with a question, because there are a lot of things that we could talk about. So, my first question is regarding the judgment NOV. We know what the standard of review is, and I'd like you to address for me why the evidence presented by the appellee does not create a substantial factual dispute so that the judgment NOV should have been granted. The appellee also relied on SPERL, S-P-E-R-L, I think it is, and I'd like you to distinguish that case. And the other issue that I'd like you to speak on is why, in the pleading that it is pled that Lewis is the agent of Alliance, and they're in control of him, why his name is not included on the verdict forms or on the special interrogatory. And I'm sure there will be questions from Justice Hoffman and Martin as we go along. Okay. So, if I may begin, your first question relates to the PEDREC standard of evidence, and we have to frame the issue in light of what the jury had to decide, but what the judge had to decide on J-N-O-V, and the issue is one of control. Control of what? It's control of the work that Lewis was engaged in to perform, driving an empty container from the pickup location to the drop location the next day. Now, we presented an overwhelming amount of evidence that Alliance was not in control of the details of that work. Very briefly, Alliance did not control Lewis, the truck, and the route. The motor carrier selected Lewis and dispatched Lewis, and Lewis had total discretion over his speed and his route. He had zero communications with Alliance before or after the accident. Very different from Spurl. Very different from Spurl. Even plaintiff's expert, Carl Berkowitz, agreed that Alliance did not control what Lewis was doing, and here's the most important thing about the J-N-O-V that I can think of. Their expert did not even evaluate the Alliance-Lewis relationship. Berkowitz was only looking at the business relationship between Alliance and Dakota. Very important. I go back to what I said at the very beginning. You have to go— Mr. Reeses. Yes. Yeah, I understand what your argument is, that Alliance had no control over Lewis, but Lewis is the admitted agent of Dakota. The real question in this case was, was Dakota the agent of Alliance? Because if Lewis is the agent of Dakota, then any actions by Lewis are the actions of Dakota itself. The real question in this case is, was Dakota the agent of Alliance? I understand what the seven amended complaints said, but I'm interested in, were they able to prove, or is there a sufficient factual question on the issue of whether Dakota was the agent of Alliance? Because if Dakota was the agent of Alliance, then it makes no difference as to whether Berkowitz has any factual control over Lewis. Lewis is the agent of Dakota, so the agent of the agent would create a liability if there's an agency relationship between Dakota and Alliance. Tell me why there is none. Okay, so first of all, what Berkowitz is testifying to is how Alliance has a relationship with the decisions in their agreement. He's not talking about Lewis, and when you're talking about Dakota being the agent, I guess I have to ask, for what purpose is that being done? Opposing counsel got up in front of the jury and said, oh, it's not the traffic accident, it's the business relationship, and the occurrence isn't even the traffic accident. You have to know what the issue is to know what had to be shown to overcome a JNOV. And when you talk about, well, Dakota's the agent, just a moment. Lewis is the wrongdoer. Lewis is the one who is negligent. Dakota's liability, if Alliance has any liability, Dakota's liability is derivative of Lewis. So Lewis has to be on the verdict for it, as far as the special interrogatory is concerned. But now you're far afield. Now you're at new trial. This is the question of JNOV. Is what evidence, or what's your position on the question of whether, as a matter of law, virtually, Dakota was not the agent of Alliance? Let's restrict to Dakota right now. Fair enough, fair enough. So Dakota, if we're going to talk about the evidence, and you're right, I was going to that this issue you're talking about is very well illustrated by the jury instruction. Because again, it didn't include Lewis. All of the case law, all of the case law, if we're talking about Doe and Shoemaker and Peterson and the federal cases, always define the agency as between the broker or the shipper alliance and the driver. He's doing the work. He is the one whose negligence, if any, can result in vicarious liability for Alliance. Dakota doesn't do anything other than dispatch him. Now I understand opposing counsel wants to talk about certain things, requirements under the Alliance Dakota contract that have nothing to do with this work. Nothing to do with hauling an empty box from point A to point B. But the relationship has to be with Lewis. That's the way it is in Doe, that's the way it is in Shoemaker, Peterson, the federal cases. Dakota, I don't have a problem with, I know I'm mixing my apples and my oranges, I don't have a problem with Dakota being in the instruction as, you know, along with Lewis, but you have to think in terms of Lewis, not in terms of Dakota, because even Dakota's liability is derivative of Lewis and the focus has to remain on Alliance and Lewis, because Lewis was the one who was given the task to do the hauling. And what Dakota does, the problem is, if you go down that road, what's going to happen is you're going to start talking about things that have nothing to do with the hauling of the empty box. That's the work. And that was the nature of the relationship, as alleged in count one, paragraph seven of the Seventh Amendment complaint, and count one, paragraph seven of the Eighth Amendment complaint after trial. It always has to have Lewis in the equation for vicarious liability. Not having Lewis would be like staging the play Hamlet without the character Hamlet. He's the one who's doing the work. Counsel, let me, because I think you missed Justice. I don't think you addressed Justice Hoffman's question. I'm going to pose it a different way. If in looking at the relationship between Alliance and Dakota and the terms of their contract, do those, does the evidence that was presented demonstrate that Alliance is doing the work that Dakota is doing or just ancillary control of things like, I'm trying to think of one ancillary thing, the sealing of the particular containers to protect them from the loss or whatever? OK, so taking another run at it, and I think I thank you, Justice Lampkin, for the opportunity. And again, Dakota is the one who's doing the training, I'm sorry, doing the hiring and the training of Lewis. And Dakota alone can fire Lewis. Mr. Reeses, you're not answering the question, hers or mine, the question is, was there a principal agent relationship between Alliance and Dakota, yes or no? And if it's no, why not? And don't tell me about Lewis right now. Tell me about the relationship between Alliance and Dakota. OK, so first of all, we have an independent, I'm sorry, we have a contract between Alliance and Dakota that says that Dakota is an independent contractor. We know that's just a label, we know we can look at the actual conduct of the party, but what's the best indicator of that relationship? The written agreement between the two of them, and that is an independent contractor relationship. And as far as other provisions are concerned, that opposing counsel relies on the non-solicitation provision, the non-compete provision, those other provisions are not connected to the task that Dakota was asked to perform. They've got nothing to do with the task at hand. So if you look at the and if you look at the conduct. OK. Everything that opposing counsel is talking about, whether we're talking, Justice Lampkin talked about the cargo security, the sealing, the and there are other things such as the use of an electronic software program and the directions about time, place and manner of delivery. They have absolutely nothing to do with what Dakota was asked to do and what Dakota was asked to do was to transport an empty box from point A to point B. And I don't think I have mentioned Lewis yet, but you understand that whether we're talking about Dakota or Lewis, none of the requirements or directions or instructions that relate to Alliance brokered freight have anything to do with hauling an empty box. And to go to the question or that Justice Lampkin began the argument with, Alliance had no control over the operative details of Dakota's work at the time of the accident, because anything that relates to an Alliance brokered load does not apply to an empty container. Now, if we talk about what I had started to allude to earlier, moving off the JNOB for a second. We may get more questions on it, but I'm a little concerned about the time, so I do want to talk about a couple of things regarding the jury instructions. All right, Counselor, and certainly I'll give you a couple of more minutes and then we'll entertain any further questions by Justice Hoffman or Justice Martin. So the first error, and there's two instructions that I want to talk about very briefly. The first relates to the 50-03 and the 50-10 in a special interrogatory that substituted Dakota for Lewis as the agent and did not refer to Lewis in those instructions. The error was not that Dakota was included. The error was in omitting Lewis when the only basis for a verdict against Alliance depended on its control over the work that Lewis was engaged to perform. Giving the instruction in the interrogatory without including Lewis as the agent confused the jury and the issue that the jury had to decide. It allowed the jury to find against Alliance without having to find that Lewis was its agent, and this was no less true under the allegations of the Eighth Amendment complaint filed after trial. The instructions in the interrogatory were at variance with the pleadings. The jury was never properly instructed on the basis of Alliance's vicarious liability without referring to Lewis as the one who was actually performing the work. And the prejudice is illustrated by opposing counsel's argument to the jury in closing, in which he invited the jury to decide Alliance's liability based on its, quote, business dealings, close quote, with Dakota, and that the occurrence in the instructions didn't even mean the crash when the truck hit the Corneo vehicle. That's a direct quote. Plaintiff could never have made that argument if the court had given an instruction and an interrogatory that included Lewis as the alleged agent. We submit the verdict was the product of that error and entitled Alliance to a new trial. The second error, very briefly, relates to the non-pattern paragraph in IPI 5010 that was lifted from Spurl. The non-pattern language minimized our independent contractor defense. Now, previously in Blockman, the appellate court held that there was no error in rejecting a sole independent contractor defense. So the point is simply that if you can't have a non-pattern instruction that emphasizes that defense, you shouldn't have a non-pattern instruction that minimizes that defense. Given the instruction, deprived Alliance of its fair consideration of its defense. And if we're correct, we're entitled to a new trial. I have a question about another issue. How many times did the plaintiff's attorney elicit or mention the issue of the insurance slash indemnity in the contract? How many witnesses were asked that question and how many times was it mentioned by plaintiff's attorney? Let's see. I think there's a mention in the opening statement. We had a continuing objection, so I think it was in the opening statement. I think that Golich, when he testified over our objection, was given the, the jury heard about the insurance provision granted with the limited instruction. And I believe that when we did not want the limiting instruction read to the jury in closing. Was Berkowitz asked about it? Yeah, Berkowitz. I'm sorry. I didn't. Berkowitz asked about it. I'm sorry, Justice Hoffman. I didn't hear that. Was Berkowitz asked about? Yes, Berkowitz. Yes, Berkowitz was asked about it too. Thank you. Berkowitz was asked about it. Two witnesses. An opening and then a closing statement. Yes. And closing. That is correct. I was thinking that there was one other person, but I'm not. Was there a vice president or? Well, it could have been. Yeah, the vice president was asked. It could have been Blum. Right. It could have been Gary Blum. It could have been Gary Blum. He's Dakota's vice president. He could have been asked about it too. So yes. My next question is, was there any other provision of the contract that the plaintiff's attorney asked three witnesses about or let's say more than one and mentioned in both opening and closing? I don't believe so. I don't believe that there was any other provision of the Alliance Dakota contract that had the same degree of emphasis. And we have, as a separate point for a new trial, argued that it was prejudicial in the circumstances of the case for the jury to hear that evidence repeatedly based on Olivera Brooks versus REMAX International, because as that case recognizes, the purchase of insurance by itself cannot support the control necessary or support the agency. But given the time constraints this morning, I did not know that that's where you're going to go. But I'm happy to answer any questions that you have on that issue or any other issue. I don't have any more questions, Justice Hoffman. I have no more. Justice Martin. Just a point of clarification. And by the way, I appreciate your analogy with Hamlet. Yeah. But as a minor point, I just wanted to make certain I heard you correctly. You mentioned about the driver hauling an empty box. And those were your words. And did you say at that point he was not the agent of Alliance? Was that your comment? Yes, correct. He was not the agent while he was engaged in that specific task at the time of the exit. Were there other occasions when he was the agent? There was no such evidence of other occasions that would ever even allow that question to be answered. But I'll leave it at that. For all the reasons set forth today, we ask you to reverse the judgment in plaintiff's favor. Thank you. Thank you, counsel. And Mr. Cosgrove, I'm going to ask you a couple of questions, too, trying to, I think, answer questions that I have. I think you agree that there's a distinction between the right to control the manner in which the work is performed and a right to control the result. So tell me, in this case, how Alliance has the right to control the manner in which their work is, I'm sorry, Dakota's work and Mr. Lewis's work is performed. Thank you, Justice, and good morning to everybody. The question that you asked is exactly the way I had planned to start my presentation to this morning. So that kind of segues well. Alliance Shippers is a shipping company that has no ability to ship anything. It's a shipping company that doesn't own trains. It doesn't own trucks. It leases equipment that we'll get into maybe in a moment, but it doesn't own any trucks. It can't move freight. It's an interesting company. It's a company whose business is a shipping company that can't ship anything. So what Alliance Shippers does is it finds clients. And in this case, Fiat Chrysler was their client. Fiat Chrysler entered into a contract to move things. We'll call them automotive equipment. And Alliance entered into a business arrangement with Dakota Lines to handle certain aspects of shipping. The motor carrier Dakota was contracted to ship certain dedicated lanes on behalf of Alliance for Fiat. This is not a situation, as my opponent references, that this was a hauling of an empty box. This case is much, much different. This is a case, and probably the only case that's ever been before our court, where there is what's called a dedicated lane. And this is a dedicated lane where there were cool requirements factually created, which goes to answer your question directly, Justice Lamkin. Did Alliance control the method and manner of the work by Dakota and therefore Lewis? And the answer to that is affirmatively yes. And that is because there was a business arrangement of a dedicated lane where there needed to always be a movement of equipment and goods from the ports. Our equipment came from California to the rail yard in Chicago, then went from the rail route in Chicago and kind of moved about to the Detroit area for automotive parts. This dedicated lane, four times a day, left from Indiana and went to various places in Michigan for automotive manufacturer Fiat Chrysler. Dakota was performing Alliance's job of what has been actually a trademark statement. And I know this is part of our supplemental record, the exhibit that was demonstrated to the jury, Alliance's quote-unquote commitment to the perfect shipment. And that's their trademark. They trademark that and advertise it and to sell that to customers like Fiat that they are going to do what they call this perfect shipment, which is the micromanagement and control of all of the shipping needs that happen in the day-to-day logistics world of our modern world. Specifically, the perfect shipment as trademarked by Alliance is the way, at least as part of the ways in which control directly is exercised over Dakota and its drivers, specifically Lewis in this case. Our direct answer to your question is that Alliance had a requirement to have a certain amount of pieces of equipment that it leased, and it leased from JV Hunt. I know in the supplemental record that lease agreement is included. It was an exhibit at our trial, the interchange agreement. Alliance needed this box, as my opposing counsel calls it, which happens to be a JV Hunt trailer that it leased. So while Alliance wasn't the owner of the trailer at the time, they were the lessee of the trailer. There was pieces of equipment that Alliance had ownership of, and there was a very small evidence deposition that was played to the jury where JV Hunt testified through their witness that the driver in Dakota had no authority to haul this piece of equipment. The only person that had the authority to utilize the equipment was Alliance shippers, and what happened is Alliance shippers would call in through dispatch to Dakota's dispatchers, and they would tell specifically what trailers could be used in our case. Gordon Lewis, the day of our incident, left Indiana, drove all the way to the Detroit area, came all the way back and went to South Holland, Chicago, which is a south suburb. I assume probably everybody knows that, but if not, I want to make sure that this is clear. They went to South Holland, and he delivered his load for the day. And if a man is dropping off his last load of the day in South Holland, which is a south suburb right off of 294, and he was going to go home to Gary, and nobody was controlling his route, he'd have got on 294, drove home, and had nothing on the back. But he didn't. That night, instead of going home after a long day to fulfill Alliance's pull requirements that it has with Fiat Chrysler to make sure that automotive equipment could leave the yard tomorrow, Gordon Lewis had to leave South Holland, go all the way south down into minority auto shippers, where he had to go into a yard where Alliance specifically directed what trailers needed to get picked up, and then they told Lewis specifically what trailer to pick up. Lewis then went and picked up a specific trailer. One of the letters of direction, as I call them in the trial, were a specific letter of direction that actually controlled the movement of what are called drops. This is a drop. This isn't hauling freight because there's nothing in the trailer. This is actually a drop. The letter of requirements or direction by Dakota specifically says in the step-by-step directions the rules and regulations that Lewis had to follow that day. In fact, one of the arguments that we made is that Lewis was being controlled and driving over his hours that day because Alliance had to have this pull requirement filled for the next day so that at the end of Lewis's day, he had to drive all the way down to minority auto suppliers and pick up this empty trailer to make sure that it was in Indiana the next morning to fulfill the pull requirements. This wasn't where he was hauling something and there was no control of it. This was literally the business model of this dedicated lane, and if you look at the attached exhibit to the J.B. Hunt interchange agreement, you'll see that the dedicated lane was specifically itemized, meaning that this piece of equipment could only be used on this dedicated lane that was being used on the day of our incident. So while my opposition has argued to the jury and also to this court that the equipment used here was not Alliance's, I think that's factually incorrect, and I think on the appellate level the court should accept the jury's finding that the equipment used here was in fact Alliance's since it was leased to Alliance and specifically was only to be used in the manner that's set in the interchange agreement. Can I ask a question? Yes. Is there any evidence in the record that Alliance ever communicated directly with Lewis? The answer to your question is an interesting one because that's one that's brought up in the appellant's brief, and what they're trying to talk about was their actual, not the right of control, but the exercise of control. My question only required a yes or a no. Is there any evidence in the record that Alliance ever communicated directly with Lewis? Only through Alliance, or excuse me, only through Dakota specifically. Okay, so Alliance communicated with Dakota and Dakota communicated with Lewis. Is that what actually occurred here? Those are the facts on the day of our incident. Yes, those are the facts of the day of our incident. Okay. So, Gordon Lewis, specifically to answer your question, instead of going home that day, called his dispatch after he dropped his load off in South Holland and said, I'm done for the day, I'm going to go home. And they said, no, you can't go home. We've got to fulfill this pool agreement, something along those lines. And you have to go down to Sauk Village to pick up this empty trailer. So, Alliance told Dakota what number needed to get picked up in the yard. Dakota then told Lewis, as its employee, and obviously Dakota can only operate, as Justice Hoffman mentioned in the question earlier, that a corporation can only act through its duly authorized agents. Lewis, acting as an agent of Dakota, took the instructions from Alliance to Dakota and followed those specific instructions, went down to the yard and picked up the specific trailer that was told by Alliance to Dakota to pick up to bring, so that it could be there for the pool requirements the following day. That's the way it worked. All right. Well, let me ask you a question that I asked your opponent. How many times did you mention insurance in questioning a witness or in arguing? I would, I think the answer to the question was it was asked to Mr. Bloom, who is the president of Dakota Lions, and the question was asked to Mr. Bloom specifically as the signatory to the contract, so that it could be admitted into evidence, so that the jury understood it. And then it was asked to the individual who was the corporate executive from Alliance, who testified that he was the corporate executive, and that this was a signature of the agreement between Alliance and... I'm not asking how many times did you ask someone to identify the contract. I'm asking you how many times did you specifically ask a question relating to the provision in the contract of insurance or indemnity? I don't have the exact number, but my response would be only in reference to the issues of agency and control was when it came up through witnesses at the time. No question. No question. But my reading of this record tells me you mentioned it in an opening statement. You asked at least two witnesses, maybe three, and you mentioned it again in closing argument. And I'm unable to find any other provision of the contract that you specifically asked about to that many witnesses or mentioned in both opening and closing argument. Can you tell me another provision? Yes, definitely. The portions of the contract that were gone through by the witnesses and certainly in closing argument would have been that Alliance can't subcontract. That was a large part of our claim that this is highly different and contrary to the way that the trucking industry works that Dakota couldn't subcontract out the work. So that was one of the allegations from the contract. The second was that Alliance could not compete with... Excuse me, that Dakota could not compete with Alliance. That was another section that came up in the contract multiple times with multiple witnesses. Another portion of it was the 10% profit that would have been taken by Alliance over any money that Dakota received if it was to have solicited or taken any of Alliance's business or customers. Another portion of the contract that came up was the addendum to the contract, which were those letters of direction. But I don't think that's exactly what the court's asking. You know, my only question is, did you mention insurance more often than you mentioned any other provision of the contract? Or did you elicit testimony of specifically insurance more often than any other segment of the contract? I don't believe so. I think it was fairly consistent with the other allegations of control that were argued in I think it was specifically asked of various issues that I had referenced. And I think there were a few others that came up from the contract, also including the non-compete. The non-compete, the can't delegate, you can't subcontract. Those would be the four issues in the contract that came up. All right. Next question I have for you. I take it the contract was admitted into evidence. Is that correct? Yes, Your Honor. Was it published in a jury? I can't recall with 100% certainty. And I don't want to mistake the evidence to Your Honor. I know for a fact that the letters of direction, which were the four or five pages that were the addendums to the contract, those were published to the jury. Okay. All right. And those were the letters of direction that had multiple different aspects of the specific multiple different aspects of the specific control that that alliance required Dakota to do. All right. If I could turn the attention just to the discussion on the Spurl contract label, I think that nobody from the defense has suggested in any of their arguments or briefs that the paragraph in, I shouldn't say paragraph, the sentence that was included in Spurl from Spurl in the modified IPI 5010 was anything but a accurate statement of law. And I think it is an accurate statement of law. And I think it's distinguishable from the Blockman case counsel referenced. Specifically, I think Blockman was a case where it was argued to include, to get rid of a section of the IPI where it says or other information. And I think that Blockman asked for just one word of, one word addition, not to include the full correct statement of the law that was referenced in Spurl. What was inadequate about the IPI instruction without the Spurl addition? The IPI 5010 without the Spurl addition did not in any way, shape or form provide the jury with the legal background of how to analyze a situation where there is a written contract. However, the actions of the parties could be different. And here it was different than the words of the contract. So it provided the jury the framework understanding that Mr. Rees has stated to your honors, which was that you could have a written contract, but it's not necessarily binding. It's one of a number of different factors. Mr. Cosgrove, you're muted. I apologize for that. I don't know how that happened. Um, I will, I will say that the contract was something that was overemphasized on behalf of my opponents. And it was something that was brought up very often over and over and over all aspects of the contract and the contract that was overemphasized by the, my opposition was something I believe the words of the contract were contrary to the actions of the parties. And, um, the sentence of the IPI was offered as a accurate statement of the loss of the jury understood how legally they were to analyze all of the facts, not picking or choosing from any specific facts, but from taking into consideration all of the different factors. Thank you for my time. All right. Any further questions, Justice Hoffman or Justice Martin? I have nothing for you. All right. Thank you. And Mr. Reiss, you had five minutes. Thank you. Okay. Thank you. Starting at 1045. Okay. So, uh, let's start first on the JNOB. A few things I want to clarify here. First of all, Alliance calls up Dakota. Alliance has no communication with Lewis. Alliance doesn't choose Lewis. Dakota selects Lewis, whether it's at the end of his 10 hours, uh, if it's on his break, whatever there. And in response to Justice Hoffman's question, there is zero, that's in quotations, zero communication directly between Alliance and Lewis. Very unlike Spurl, where there was constant communications between the shipper and the refrigerated product that had very exacting requirements. A big difference between an empty box and having a refrigerated load. Okay. Council talks about dedicated lanes. The dedicated lane is from XL Portage to Detroit Link the next day. At the time of the accident, he is not on a dedicated lane. It is totally up to Mr. Lewis, whether he will be traveling at one speed or another speed or what route he will take from the pickup point to his drop yard at the end of the day before he hauls to XL Portage the next morning. Totally within his control. Dedicated lane never enters into it. Council talked about the pool requirements. The pool simply explains why the empty box was being hauled between two points. It doesn't have anything to do with whether Alliance was controlling the transportation of the empty box between those two points. Simply, but let's suppose, just for the sake of argument, that you say, well, Alliance supplied the trailer. That in and of itself doesn't create an agency. And we would cite Kolchinsky, which is cited in our brief. Kolchinsky is 949 Federal 3rd at 1010 pinpoint citation 1015, which says simply supplying the trailer does not create the agency, and it cites an Illinois appellate decision, Shoemaker at 267 LF 3rd at 775 at page 783. So even if you talk about the empty box, and it was sitting on a chassis, so technically it may not be a trailer, it's a box, even if it's supplied by Alliance, it doesn't create an agency with Lewis at the time of the accident. Council talked about the directions, the directions that are attached to the contract between Alliance and Dakota, and that contract and the directions, they talk about live drops when you have a load and you need to have somebody there to unload it. It has nothing to do with an empty box. This was a drop and hook in the parlance of the trucking industry. When he went there, if the accident had not intervened, he would have dropped the box and then gone and picked up a load, if there was a load for him, and then gone into the dedicated lane. But at the time of the accident, the previous day, he wasn't on the lane, and this was not subject to any type of drop, live drop directions. The only other two points I want to close with are, first, on the agency instruction. I cannot emphasize it enough. It misstates liability not to include the actual wrongdoer, Gordon Lewis, in the instruction. It takes the focus away from the work and then has the jury think about other business aspects of the relationship. Berkowitz isn't even talking about the Alliance-Lewis relationship, and the instruction unfairly misstated the basis for liability. Finally, with regard to the non-IPI language taken from Spurl, the issue isn't whether it was an accurate statement. The issue is whether it unduly emphasizes one point or unduly minimizes our defense. I think Justice Hoffman had it right when he asked the question, how is the IPI inadequate? If it's not inadequate, you can't include the non-pattern language that unduly minimizes our defense. So, for all the reasons that we've argued today and in our briefs, we ask you to reverse one last thing. I want to thank the court for the opportunity to give us oral arguments. Presiding Justice Lampkin said at the beginning this is an interesting case. It's an important case. And we thank you for your time and attention this morning. Thank you. I thank both of you for very thorough presentations. And we do have lots of issues to discuss. We're going to stand adjourned at this time. And we will have an opinion hopefully sometime soon. So everyone, have a good day. Justice Hoffman and Justice Martin, please stay on. Thank you.